Filed/Docketed
June 6, 2006

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN RE:

WILLIAM R. SATTERFIELD,      Case No. 04-14709-M
                                                       Chapter 7

Debtor.

## MEMORANDUM OPINION

In this dispute over a claim of exemption, the Court is asked to decide whether a house is a home. The debtor, who is presently incarcerated, claims the property as his exempt homestead. The bankruptcy trustee contends that, as a result of use of the property for commercial purposes, the debtor is entitled to no more than a $5,000 exemption. After a thorough review of the evidence and argument advanced by the parties, the Court finds in favor of the trustee. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052, which is made applicable to this contested matter by Bankruptcy Rule 9014.

## Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C.A. § 1334(b).[1] Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C.A. § 157(a). The issue presently before the Court is a core proceeding as defined by 28 U.S.C.A. § 157(b)(2)(B).

## Findings of Fact

William R. Satterfield ("Satterfield") is the debtor in this Chapter 7 bankruptcy case. Patrick J. Malloy III ("Malloy" or "Trustee") is the duly appointed trustee. The dispute between the parties centers around real estate located at One West 81st Street, Tulsa, Oklahoma, which the parties have

---

[1] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq*.

referred to as the "White House Mansion" (the "White House"). The White House is located within the city limits of Tulsa and sits upon an undivided 9.76 acre tract. The White House was built in 1985.[2] For purposes of this opinion, the Court finds that the square footage of the White House (not including the outdoor deck) is 7,050 square feet.[3]

The White House is a three story building. The first floor can be split into three major areas, a ballroom, an addition described by the parties as "the Annex," and the balance of the first floor, comprised of several smaller rooms. The ballroom is a large (1,092 square foot) open area, with a wet bar and fireplace. The ballroom has large double doors which open out onto an open air patio or deck.[4] The "Annex" contains 1,010 square feet. Located in the Annex are a commercial grade kitchen, office space and storage space. The commercial grade kitchen includes a vented and sprinklered range hood and a three vat commercial sink. The sink has separate vats for washing, rinsing and sanitizing dishes. Such a sink is required under Tulsa City and County Health Codes if food is to be served to the public. The remainder of the first floor area is comprised of approximately 1,986 square feet. Included in this area are an entrance or foyer, the original kitchen, a den, a library, stairway, and dining room. With respect to the original kitchen, Satterfield testified

---

[2] The evidence before the Court was in dispute to some degree about the means of construction but that dispute is not germane to the issue before the Court.

[3] Once again, there is some dispute regarding the square footage of the White House. Satterfield testified that the White House had over 8,500 square feet, while an appraisal that was offered and received into evidence showed the White House as having 7,997 square feet. Mr. Robert Goble, an experienced real estate broker and developer who inspected the White House and measured the rooms contained therein, found that the square footage of the White House was 7,050 square feet. It is this number which the Court chooses to rely upon.

[4] Satterfield contends that the ballroom is actually only 297 square feet in area. The Court, having heard the testimony of Mr. Goble, and having reviewed photos and a video of the ballroom, finds that the ballroom is 1,092 square feet.

that the kitchen remained functional. Other witnesses testified that the range had been removed from the kitchen and that it was no longer used as an area of actual food preparation. Photographs and video offerings received into evidence show no evidence of a cooktop or an oven in this kitchen.

Adjacent to the ballroom is a large (1,194 square feet) deck, comprised of an open area with outside seating. Behind the deck is an in-ground swimming pool. Numerous tables and chairs have been placed on the deck. The location and number of the tables and chairs placed upon the deck is consistent with its use for weddings or other social functions.

The second floor is comprised of 2,194 square feet. On the second floor are located at least two bedrooms and two bathrooms. One of the bedrooms is described by Satterfield as a master suite with its own bathroom, closet, and sitting area. During the time period that Satterfield resided at the White House, he used this bedroom as his principal place of residence. The third floor contains 768 square feet and appears to have been originally structured as bedrooms. However, the evidence presented to the Court indicated that most if not all of the third floor was used as storage.

The Court finds that the White House was configured for use as a reception hall with full catering facilities. Satterfield used the White House for this purpose after its construction in 1985. Signs outside the White House indicated its availability for weddings, parties, and receptions. A sign was posted on the exterior of the Annex stating that the White House was shown by appointment only. Satterfield also had brochures created to market the White House which included the following information:

### Introduction

White House Mansion offers an affordable and alternative location for events requiring the *casual* and *easygoing* comfort of a *country* estate in a large outdoor setting surrounded by trees and ample parking. The Mansion's design and location make it unique for anything from weddings and casual parties to business meetings. We offer the opportunity to get away from it all by being located just minutes away from the hustle and bustle of surrounding cities and towns. Please contact us for any questions or more information. We look forward to serving you!

### Receptions Meetings and Special Events

White House Mansion's spacious rooms are perfect for weddings, business meetings, showers and special events. Whether planning an event for fifteen or one hundred fifty, the White House Mansion provides the ambiance to the occasion.

### Fees

Rental fees are based on a three (3) hour minimum charge. Fees do not include setup and tear down of equipment, chairs, tables, etc. either inside or outside the facility - these are the responsibility of the renter. We will be happy to provide the renter with a listing of party suppliers, instrumentalists, caterers and coordinators.

### Use and Accommodations

White House Mansion will accommodate approximately 100 people for a "sit down" dinner in the main ballroom. If, however, you don't mind having your guests scattered into other areas of the mansion, you are welcome to seat more. The main ballroom can seat up to approximately 100 people for a program such as a concert, wedding or seminar with space for a lectern or an altar area.[5]

In the five years prior to his entry into business arrangements with a business entity known as the "Spice of Life" (which will be discussed later in this opinion), Satterfield admitted that he had booked approximately two dozen events at the White House. However, in statements to other people as part of his efforts to market the White House, Satterfield represented the number of bookings to be much larger. Satterfield did not personally observe the functions at the White House.

---

[5] *Trustee's Ex.* 24.2.

He either left the premises or stayed in his room while the events were underway.

The "Spice of Life" was a catering business operated by Mr. William Doyle ("Doyle"). In the fall of 2000, Doyle and Satterfield entered into an agreement for use of the White House by Doyle and his business. Originally, the Spice of Life held and catered functions at the White House and paid Satterfield a percentage of the revenues generated as a result. Later, the agreement was modified to provide the payment of rent of $7,000 per month by Spice of Life to Satterfield.

Upon obtaining possession of the White House, Doyle made some improvements to the property. He built a commercial kitchen, including a three vat sink and a hand washing area for employees handling food. Doyle removed the old deck and built the deck presently appurtenant to the White House. Doyle testified that his reason for building the deck was to provide more space for events at the White House and to increase the usefulness of the same to prospective customers.

The Spice of Life used the commercial kitchen to prepare food to be served at events at the White House as well as food to be served off site. The Spice of Life used the entire first floor of the White House for its business operations. The upstairs bedrooms and bathrooms (except for the master suite occupied by Satterfield) were used by the Spice of Life during catered events. Brides and other patrons of the Spice of Life used these areas as dressing rooms. The Court assumes for purposes of its decision today that Spice of Life used none of the third floor in its business operations. Ultimately, the Spice of Life business venture proved unprofitable. The business was terminated in or around May of 2003.

In December of 2004, Satterfield began negotiations with Quentin Turner ("Turner") regarding use of the White House. Turner is the owner of a Tulsa business known as The Catering Connection. He has been in business for twenty years. Satterfield had no prior relationship with

Turner. Satterfield asked Turner if he was interested in leasing the White House for $3,000 per month as part of his catering operations. To use Turner's words, Satterfield "begged" Turner to lease the White House. During the course of the negotiations, Satterfield represented to Turner that he had held numerous events at the White House in the past and showed Turner the brochure previously identified. After about two weeks of negotiations, Turner and Satterfield entered into a lease agreement. Under the terms of the lease, there were no restrictions on the use of the White House by Turner. Turner booked and held between fourteen and twenty-one functions while in control of the White House. The largest function was for between 150 and 200 people. During the term of the lease Turner had an employee living at the White House. That employee booked events at the White House, prepared for those events and provided some measure of security. Ultimately, Turner determined that the venture was not profitable and terminated the lease in July of 2005.

After the lease with Turner was terminated, the White House was not used as a catering center or reception hall. Satterfield has been convicted of various federal crimes and is presently incarcerated at a facility in El Reno, Oklahoma. The employee hired by Turner continues to reside in the White House and pays rent to Satterfield's ex-wife in the sum of $450 per month.

On August 16, 2004, Satterfield filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. In the original Chapter 11 case, Satterfield claimed the White House and the 9.76 acre tract as his exempt homestead. The first meeting of creditors was held on September 22, 2004. The deadline to object to exemptions was October 22, 2004. No objections were made to the claim of the White House as exempt. Satterfield continued in a Chapter 11 case for approximately eighteen months. He attempted to confirm a Chapter 11 plan without success. On September 26, 2005, Satterfield filed a pleading entitled "Supplemental Information to First

Amended Disclosure Statement."[6] He attached a real estate appraisal to this pleading. In the appraisal it was stated that Mr. Satterfield had made representations to the appraiser that the White House "was rented for $11,600.00 per month to a caterer/reception hall."[7] Moreover, the appraiser found that the highest and best use for the White House was its present use as represented by Satterfield.

Despite the efforts of Satterfield, no Chapter 11 Plan was ever confirmed. On February 23, 2006, the case was converted to a case under Chapter 7 of the United States Bankruptcy Code. Malloy was appointed to serve as trustee. The first meeting of creditors was originally scheduled on March 20, 2006, and thereafter continued to April 17, 2006. On March 20, 2006, Malloy filed his objections to the claim of the White House as an exempt homestead. An evidentiary hearing was held on Malloy's objection on May 24, 2006. Following the conclusion of that hearing, the matter was taken under advisement.

**Burden of Proof**

The burden of proof is upon the objecting party, the Trustee, to show by a preponderance of the evidence that an exemption is not properly claimed.[8] The homestead exemption statute should be liberally construed in favor of debtors to allow for the protection of the family and their home.[9] The existence and extent of a homestead are questions for the trier of fact.[10]

---

[6] *Ex.. No. 25*.

[7] *Id.* at p. 23.

[8] *See* Fed. R. Bankr. P. 4003(c); *see also In re Simpson*, 206 B.R. 230, 232 (Bankr. E.D. Okla. 1997).

[9] *See In re Martin,* 875 P.2d 417, 422 (Okla. 1994).

[10] *In re Kretzinger,* 103 F.3d 943, 946 (10th Cir. 1996).

**Conclusions of Law**

Malloy claims that the White House may not be claimed as exempt, or, if an exemption is allowed, any such exemption is limited to the sum of $5,000. Satterfield contends that Malloy's objection to the claim of exemption is untimely and that, in any event, the claim of exemption is valid. The Court will consider each argument in turn.

*Timeliness of the Objection to Exemption*

This case began as a Chapter 11 case, with its first meeting of creditors being held on September 22, 2004. Satterfield claimed the White House as exempt without objection. Under Bankruptcy Rule 4003(b), "[a] party in interest may file an objection to the list of property claimed as exempt only within 30 days after the meeting of creditors held under § 341(a) is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later."[11] When the case was converted to Chapter 7, a second meeting of creditors was scheduled. Malloy filed his objection to the claim of the White House as exempt well within thirty days of that meeting of creditors. The question before the Court is which date applies for purposes of Bankruptcy Rule 4003. Satterfield argues that all objections to his claimed exemptions had to be filed within 30 days of the conclusion of the meeting of creditors held while this case was a Chapter 11 case. Such a ruling would render Malloy's objection untimely. Malloy argues that the conversion of the case to Chapter 7 and the scheduling of another meeting of creditors causes the time for objecting to exemption to recommence, and that, as a result, his objection is timely.

The Court is not writing on a blank slate when it comes to this issue. The Bankruptcy Appellate Panel of the Tenth Circuit, in a thoughtful and well-reasoned opinion, has concluded that,

---

[11] Fed. R. Bankr. P. 4003(b).

when a case is converted from Chapter 13 to Chapter 7, the time for objecting to the debtor's exemptions runs anew from the date of the meeting of creditors in the Chapter 7 case.[12] The rationale applied in *Campbell* is equally applicable where an individual debtor has his case converted from Chapter 11 to Chapter 7. The Court will not restate the analysis in *Campbell* herein, but adopts its analysis and conclusions by reference. On that basis, the Court concludes that Malloy's objection to the claim of the White House as exempt was timely filed.

*Validity of the Claimed Exemption*

Pursuant to § 522 of the Bankruptcy Code, a Chapter 7 debtor may exempt certain property from the bankruptcy estate and place it beyond the reach of creditors, while non-exempt property becomes part of the bankruptcy estate. In a Chapter 7 bankruptcy case, all exemption entitlements (including that of homestead) are determined as of the date the case is filed.[13] Oklahoma has chosen to opt out of the federal exemption scheme, limiting the exemptions available in bankruptcy cases to those allowed under state law.[14] Oklahoma law provides for the following homestead exemption:

> A. Except as otherwise provided in this title and notwithstanding subsection B of this section, the following property shall be reserved to every person residing in the state, exempt from attachment or execution and every other species of forced sale for the payment of debts, except as herein provided:
>
>  1. The home of such person, provided that such home is the principal residence of such person;[15]

The statute also places restrictions on the homestead exemption when the property is used for

---

[12] *In re Campbell*, 313 B.R. 313 (10th Cir. BAP 2004).

[13] *See Mansell v. Carroll*, 379 F.2d 682, 684 (10th Cir. 1967); *see also In re Klaus,* 228 B.R. 475, 478 (Bankr. N.D. Okla. 1999).

[14]  *See* § 522(b)(1); *see also* Okla. Stat. Ann. tit. 31, § 1(B) (West 1991 & Supp. 2006).

[15] Okla. Stat. Ann. tit. 31, § 1(A)(1) (West 1991 & Supp. 2006).

commercial as well as residential purposes:

> C. The homestead of any person within any city or town, owned and occupied as a residence only, or used for both residential and business purposes, shall consist of not exceeding one (1) acre of land, to be selected by the owner.
>
> For purposes of this subsection, at least seventy-five percent (75%) of the total square foot area of the improvements for which a homestead exemption is claimed must be used as the principal residence in order to qualify for the exemption. If more than twenty-five percent (25%) of the total square foot area of the improvements for which a homestead exemption is claimed is used for business purposes, the homestead exemption amount shall not exceed Five Thousand Dollars ($5,000.00).[16]

Debtors are entitled to exempt one homestead per family.[17]

Malloy takes issue with the claimed exemption of the White House on two grounds. First, he notes that the White House lies within the city limits of Tulsa and that, under Oklahoma law, Satterfield is limited to a homestead exemption of one acre, not the 9.76 acre tract of land which he has claimed. In addition, Malloy argues that more than twenty-five percent of the White House is used for business purposes, and that, as a result, Satterfield is limited to a homestead exemption of $5,000. Satterfield confesses the former point, and admits that he is entitled to no more than a one acre tract of land as his homestead.[18] It is the alleged use of the White House for business purposes which remains in dispute.

The Court has found the total area of the White House (excluding the deck) to be 7,050

---

[16] Okla. Stat. Ann. tit. 31, § 2(C) (West 1991 & Supp. 2006).

[17] *See Glaze v. Drawver*, 117 P.2d 544, 546 (Okla. 1941).

[18] In a pleading filed just prior to the evidentiary hearing on this issue, Malloy argued that Satterfield and his counsel should be sanctioned for their attempt to claim the entire 9.76 acre tract as exempt. *See Docket No. 784.* At the evidentiary hearing on this matter, counsel for Satterfield stated on the record that Satterfield sought no more than a one acre parcel as exempt. Given this admission, and due to the fact that the Trustee was not required to further litigate this issue, the Court declines to award sanctions against Satterfield or his attorney.

square feet.  Under Oklahoma law, if more than 1,762.5 square feet (25%) of the White House is used for business purposes, the homestead claim is limited to $5,000.  The Court finds that, at a minimum, the entire first floor of the White House, including the ballroom and the Annex, were used by Satterfield and/or his tenants (Spice of Life and Turner) for business purposes.  This area totals 4,088 square feet, or 57.99% of the total area of the White House.  As a result, Satterfield is limited to a homestead exemption claim of $5,000 in the White House.

## Conclusion

The Trustee's Objection to Debtor's Claim of Homestead Exemption is sustained.  Satterfield is limited to a homestead exemption of Five Thousand Dollars ($5,000) in the White House.  No sanctions are awarded against Satterfield or his attorney at the present time.  A separate judgment in accordance with this Memorandum Opinion is entered concurrently herewith.

Dated this 6th day of June, 2006.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

11

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 6, 2006, a true and correct copy of the above and foregoing Memorandum Opinion was mailed by First Class United States Mail, postage prepaid, to:

William R. Satterfield
09549-062
Federal Correction Camp
P.O. Box 1500
El Reno, OK 73036

William R. Satterfield
P. O. Box 1000
Jenks, OK 74037

*/s/ Judy Johnson*

4595.2